David T. Tran
1871 Donner Ave.
San Francisco, CA 94124
(415) 497-8534
trantdavid@gmail.com

David T. Tran, In Pro Per

FILED BY _____ D.C.

JUN 0 3 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**David T. Tran,**

                    Plaintiff,

        v.

**Ross University
School of Medicine**

            Defendant

) CASE NUMBER:
)
)
)
)
) _____
)
) COMPLAINT FOR DAMAGES FOR:
)
) 1) BREACH OF IMPLIED-IN-FACT
)    CONTRACT;
) 2) BREACH OF CONTRACT;
) 3) BREACH OF COVENANT OF GOOD
)    FAITH AND FAIR DEALING;
) 4) MISREPRESENTATION;
) 5) NEGLIGENCE;
) 6) NEGLIGENT INFLICTION OF
)    EMOTIONAL DISTRESS
)
)
)

## DEMAND FOR JURY TRIAL

**PARTIES**

1.     David Tran (PLAINTIFF) brings suit before the Southern District of Florida Court *pro se* and *in forma pauperis* as a result of from his unjust dismissal from defendant's (hereinafter referred to as ROSS) educational institution. At all relevant times and periods in which the cause of actions arose, PLAINTIFF was (and remains) a citizen of California, and ROSS was a corporation *incorporated* on the East Caribbean island nation of Dominica, Lesser Antilles, BUT with its principal place of business in the US state of Florida, able to receive process at 2300 SW 145th St., Suite 200, Miramar, Florida 30027 (Registration #G17000130429) (See Florida's Department of the Secretary, under fictitious names). ROSS is a private, for-profit medical school, conducting its Basic Sciences (16 months) portion of the 4-year medical curriculum in Dominica. The remainder of the curriculum is completed at clinical sites throughout the United States. Moreover, this suit stems from common law contract claims AND the nature of the Early Complaint Resolution (ECR), an agreement mediated and drafted by the Office for Civil Rights (OCR) (as part of the US Department of Education) between both parties. At the time of mediation, and upon signing of the agreement, both parties - and more importantly, mediators from OCR - were present within the United States.

**JURISDICTION and VENUE**

2.     For this Court to exercise full jurisdiction, personal jurisdiction and subject matter jurisdiction requirements must be met. In this case, subject matter jurisdiction is satisfied through 'diversity' pursuant to 28 U.S.C. § 1332(a) since PLAINTIFF and ROSS were and are citizens/corporations of different States AND the amount PLAINTIFF seeks in damages exceeds $75,000.

3.     Personal jurisdiction requirements can be met *either* "generally" or "specifically". General jurisdiction is met since ROSS has its principal place of business and administrative offices within Florida (more specifically, within this District). In addition, the defendant may meet specific jurisdiction since it is subject to Florida's long-arm statute if, among others, it is "operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state [Florida Statutes § 48.193(1)(a)] … or it is engaged in substantial and not isolated activity within this state, <u>whether such activity is wholly interstate, intrastate, or *otherwise*, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity</u> [Florida Statutes § 48.193(2)]". For these reasons, personal and subject matter jurisdiction requirements must be (and is) met, hence giving this Court full jurisdiction. Moreover, the Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367(a).

4.     Venue is proper since the defendant can be haled to a judicial district in which it is subject to the court's personal jurisdiction. 28 U.S.C. § 1391(b)(3).

## TIMELINESS

5.     Suit should be deemed timely since the last element of PLAINTIFF's claims did  not occur until he was unjustly dismissed in May of 2013 (and second complaint to OCR was denied in January 2014) and "can be held to be 'injured' only when the accumulated effects … manifests themselves" (see, *Accord, Urie v. Thompson*, 337 U.S. 163 (1949). Hence, PLAINTIFF would not be able to state a claim to file suit since the cause of action accrues only when the last element constituting the cause of action occurs. For contract and tort (and fraud) cases in the state of Florida, the 5-year and 4-year statute of limitations, respectively, applies to this case.

6.     For purposes of this case, it is important to understand the amount of time that has run under the period of limitations. PLAINTIFF initially filed suit in the Superior Court of Riverside County on September 22, 2016 (first court filing following OCR's appeal denial on January 23, 2014). This case was removed to federal court by ROSS and later voluntarily dismissed by PLAINTIFF on November 1, 2016. The period of limitations does not run during pending actions and until 30 days after the case was dismissed (voluntarily) pursuant to 28 USC Section 1367(d). PLAINTIFF re-filed the case on March 27, 2017 in the Central

District Court of California. This case was ultimately dismissed by the Honorable Judge Jesus Bernal on March 16, 2018 due to PLAINTIFF's failure to (due to not being knowledgeable about the law) establish personal jurisdiction over the defendant (PLAINTIFF initially filed in California and New Jersey). Moreover, the period of limitations is tolled during the pending actions stemming from PLAINTIFF's suit re-filed on March 27, 2017 and for 30 days after it was dismissed on March 16, 2018. See 28 USC Section 1367(d). Hence, the period of limitations for claims has run from February 23, 2014 (30 days after OCR's decision to deny PLAINTIFF's appeal on January 23, 2014) *through* September 22, 2016, December 2, 2016 *through* March 26, 2017, and April 17, 2018 *through* the current time (May 31, 2019). This equates to a total of under four years (approximately 3 years and 362 days). All cases dismissed were *without* prejudice and the claims in this complaint are so related to previous claims in line with the limitations period.

## **GENERAL BACKGROUND**

6.     PLAINTIFF was medically diagnosed with Obsessive-Compulsive Disorder (OCD) during high school and requires reasonable academic accommodations in order to minimize the effects his disability on his ability to perform academically. PLAINTIFF is an "otherwise qualified" individual with a physical or mental impairment that substantially limits one of "major life activities"

under Section 504 of the Rehabilitation Act of 1973 (as amended), in particular his difficulties with concentration arising from the nature of his disability (OCD). Furthermore, ROSS is to comply with Section 504 since it is a program that receives federal financial aid funding from the US Department of Education.

7.     A minimum 2.00 GPA is required by the end of the fourth semester of studies in order to advance to clinical studies beginning the fifth semester. If this "GPA factor" is not met by the conclusion of the fourth semester, the student is subject to academic dismissal. A student is also subject to academic dismissal if he/she fails more than one (two or more) course while a student at the School of Medicine. Furthermore, a new grading policy was implemented during PLAINTIFF's fourth semester, in which multiple failed courses were permitted as long as they occurred within the same semester.

## STATEMENT OF FACTS AND HISTORY

8.     During his first semester in 2011, PLAINTIFF suffered from disability discrimination, resulting from the inability of ROSS to provide reasonable academic accommodations as required under 34 C.F.R. § 104.44. PLAINTIFF had provided supporting documentation and was entitled to accommodations to minimize the effects his disability had on a "major life activity" as listed in § 504, concentration. A very reasonable accommodation would be time extensions on examinations, which was not granted despite such requests. Such accommodations

are imperative for PLAINTIFF to succeed. Moreover, PLAINTIFF was simply ignored for a couple of months immediately following the first exam after he had alerted administrators the need for time extensions during examinations. He wrote numerous e-mails to administrators regarding his situation and the need for appropriate accommodations which were simply ignored until his complaint to OCR later on.

9.     As a result of the occurring violations, PLAINTIFF was unable to perform to the best of his abilities given the circumstances since examinations taken during the first semester measured his disability rather than his acquired knowledge. PLAINTIFF was forced each time to "bubble" in answers as time ran out.  Failing his examinations ultimately led to his academic dismissal in April of 2011 after his first semester of attendance for "poor academic performance".

10.     PLAINTIFF filed a complaint with the Office for Civil Rights (OCR) during the summer of 2011, alleging disability discrimination and ROSS' longstanding neglect towards PLAINTIFF regarding disability accommodations. Both parties agreed to undergo Alternative Dispute Resolution (ADR) and an ECR agreement was produced and signed on October 21, 2011.

11.     As stipulated under the ECR agreement, PLAINTIFF re-matriculated at the School of Medicine in January of 2012, repeating as a first semester student and was given reasonable academic accommodations.   With the help from such

accommodations, PLAINTIFF was able to pass all of his courses with solid grades. At the end of the semester, however, PLAINTIFF realized that the three "F" grades received in 2011 were actually averaged into the overall GPA, which was not clarified during ADR, and would have played a significant role during the negotiation process. Hence, although passing all of his courses with solid marks at his re-attempt of the first semester, PLAINTIFF's GPA remained well below the minimum 2.00 required by the end of the fourth semester to advance to the clinical semesters beginning the fifth semester.

12.    During the re-attempt of his first semester, PLAINTIFF began to realize that the underlying nature of the ECR agreement was unjust, unconscionable, misrepresented, and oppressive for the reasons below:

a) ROSS failed to disclose to PLAINTIFF during ADR of any grading policy changes that took into effect beginning January of 2012 for incoming matriculants. The change in grading policies made it much more difficult for PLAINTIFF to progress through the medical school curriculum and meet the "GPA" factor required by the end of the fourth semester. With the inclusion of the 3 "F" grades (grades received when not given the required accommodations) that were averaged into PLAINTIFF's overall GPA, in addition to ROSS' failure to notify PLAINTIFF of a new grading policy upon his re-matriculation, this

made it ever more difficult to attain the "GPA" factor.

b) Clause 4 within the ECR agreement was formed out of fraud or negligent misrepresentation of material facts that negatively affected PLAINTIFF's chances of progressing through the medical curriculum successfully.

Hence, it is understandable and true that "meeting of the minds" during formation of the ECR agreement was absent.

13.   Very concerned about the change in grading policies and how this could potentially be detrimental to his chances of progressing through the curriculum, PLAINTIFF immediately (during the first semester) e-mailed the school's academic dean, Dr. Joseph Flaherty (FLAHERTY), regarding the issue. FLAHERTY denied PLAINTIFF's request to get the issue remedied, mentioning that such requests were "without merit". Hence, not only has PLAINTIFF succumbed to the tougher grading policy changes upon his re-matriculation, there was also the obstacle of overcoming the three "F" grades received in 2011 that were averaged into his overall GPA in order to meet the "GPA" factor by the end of the fourth semester.

20.     Displeased and distraught over the matter, PLAINTIFF filed another complaint with OCR, alleging disability discrimination. However, the allegations were not considered for evaluation because PLAINTIFF failed to mention how the

change in grading policies constituted disability discrimination since OCR only has jurisdiction regarding protected statutes such as race, color, sex, age, and disability.

21.     From May through August of 2012, PLAINTIFF passed all of his second and third semester courses, although marginally. Marginally passing is still considered "passing" and students have been promoted to the clinical semesters despite marginal or near marginal performance. However, the inability of Dean to revert the grading policies for PLAINTIFF caused a major distraction. Given the nature of PLAINTIFF's disability and the effect it had on his ability to concentrate, such distractions were only exacerbated. Despite the distractions, PLAINTIFF managed to pass all of his courses by way of being granted time extensions during his examinations and persevering under adverse circumstances.    Hence, PLAINTIFF could have performed better academically but for the major distractions than what results actually show on an academic transcript. Moreover, although PLAINTIFF was given time extensions on examinations, it is good to note that time extensions were not granted on learning the vast amount material, making it even more remarkable that PLAINTIFF was able to pass his courses.

22.     During his fourth semester (January of 2013 through April of 2013), PLAINTIFF experienced some minor personal issues, but also significant fears of racial or personal discrimination as a result of unfair treatment towards him in one of his courses, thus creating an extremely hostile environment unconducive to

learning that proved to be detrimental to PLAINTIFF's psychological and emotional well-being as well as academic performance.

23.    One of the instructors in the ICM subportion of the CCSB course, Dr. Worrell Sanford (SANFORD), subjected PLAINTIFF to pervasive mistreatment and discrimination lasting about three quarters of the course. PLAINTIFF was often inappropriately reprimanded and belittled by SANFORD. As a result, SANFORD gave PLAINTIFF three "poor" grades, which automatically constituted a failure in the ICM subportion, hence, failure from the entire CCSB course. Such targeted treatment inflicted severe psychological trauma, thus causing PLAINTIFF to miss several class meetings due to fear of further negative treatment from the instructor and his inability to sleep. Furthermore, the "feeling" of being discriminated upon had devastating psychological and emotional consequences as well.

24.    PLAINTIFF's psychological ill-health brought him to see Ms. Catherine McCarthy (MCCARTHY), LCSW, one of the clinical counselors at the School of Medicine. MCCARTHY described PLAINTIFF as suffering from a "grave" psychological state. She also wrote "letters of excuse" for PLAINTIFF after missing mandatory CCSB activities due to the rapid deterioration in his mental health as a result of learner mistreatment by SANFORD.

25.    A couple of weeks prior to the final examination, Dr. Lynn Sweeney (SWEENEY), one of several CCSB coordinators, arranged a meeting with

PLAINTIFF, with PLAINTIFF requesting that MCCARTHY be present. At the meeting, MCCARTHY reiterated that it was essential that people around PLAINTIFF provided support for him, including ROSS, stemming from the severe psychological adversity PLAINTIFF was experiencing.

26.    With issues in the ICM subportion, one of the clinical directors, Dr. Philip Cooles investigated the issue and determined that there were dilemmas with the "student-instructor" interaction and that PLAINTIFF's three "poor" grades issued by SANFORD would not count against him. At the same time, the only other east asian student in the class section (led by SANFORD) was also receiving arbitrary "poor" grades, which was determined, by COOLES, to not count against him due to issues with the "student-instructor" interaction as well. Hence, there was acknowledgement from ROSS that the "student-instructor" interaction was out of the ordinary, which would be unfair towards PLAINTIFF and the other student. Furthermore, PLAINTIFF was allowed to relocate to a different section and instructor for ICM. However, relocation was granted towards the end of the semester, when much psychological damage had already occurred and most of the ICM activities and grades have been determined. It is also important to note that almost everyone, historically, easily passes the ICM subportion and a student receiving even one "poor" grade within this subportion of ICM is very uncommon.

27.    Concurrently, and at the time PLAINTIFF was dealing with the

unfortunate issues in SANFORD's subportion of ICM, he also had the burden of dealing with multiple unexcused absences in other CCSB portions, due to his psychological and emotional instability stemming from SANFORD's discriminatory behavior towards PLAINTIFF. By missing a certain amount of mandatory CCSB activities (aside from the three "poor" grades) without valid excuses, PLAINTIFF was at risk of failing the course as well. In fact, one could also fail CCSB by receiving at least two unexcused absences.

28.     Concerned about these   unexcused absences mainly due to his psychological demise, PLAINTIFF emailed FLAHERTY, hoping that at least one of the unexcused absences would be "overlooked" and pardoned, similar to the "poor" grades pardoned by COOLES, so that PLAINTIFF could pass the CCSB course.  FLAHERTY did not respond until PLAINTIFF sent him repeated e-mails, in particular one depicting a "sobbing" story, hoping that by taking responsibility rather than *seeming* to make an excuse for academic troubles, FLAHERTY would pardon the unexcused absences. PLAINTIFF was reluctant to further mention issues regarding his interactions with SANFORD and the emotional and psychological ramifications stemming from such interactions due to fear of retaliation and lack of trust in the administration as history has shown. Hence, accepting responsibility seemed like the only safe route at the time. FLAHERTY actually replied with "I'll try my best, but I can't promise you anything."

FLAHERTY never replied thereafter regarding his decision to overlook the unexcused absences. In all, PLAINTIFF had a total of 5 unexcused absences for which 3 were eventually excused upon PLAINTIFF performing "make-up" work. A fourth opportunity to perform "make-up" work was not given.

29.    As a result of the 2 unexcused absences, PLAINTIFF was notified a week prior to the final examinations that he had failed CCSB. It was at this time that some faculty members recommended PLAINTIFF to take a leave-of-absence (LOA) knowing that he had already failed CCSB, which would allow PLAINTIFF to start anew the following term. Once a student takes the final examination, he or she cannot file for LOA. Failure in *any* one course within a semester meant that the student failed the semester and must repeat the entire semester. Meanwhile, PLAINTIFF was awaiting a response from FLAHERTY in regards to his unexcused absences in CCSB and felt confident that FLAHERTY would overlook the absences based on his previous response. The administration did not articulate clearly the reasoning for recommending LOA because PLAINTIFF knew that only one failed course within a semester (if it occurs only once) was permissible and would not subject a student to dismissal. The failure in CCSB would be PLAINTIFF's first "F" grade and, hence, would not place PLAINTIFF under "subject to dismissal". However, PLAINTIFF was extremely hesitant to file for LOA based on particular circumstances that administration failed to take into

account despite PLAINTIFF explaining to the administration.

    a) Dr. Matthew Nelson (NELSON) mentions that there was the possibility of PLAINTIFF being dismissed for not meeting the minimum 2.00 "GPA factor". However, NELSON failed to realize that PLAINTIFF's chances of meeting the criterion was highly unlikely since PLAINTIFF would have to achieve nearly "straight A" grades the following term. PLAINTIFF even mentions this to administration, but further advice was not given or was ignored. It is extremely questionable to the reason for administration to even mention the "GPA" factor this late into PLAINTIFF's academic enrollment. Simply put it, PLAINTIFF was forced in such a difficult situation due to ROSS' inability to counsel PLAINTIFF of his academic difficulties (as perceived by ROSS prior to semester 4) and inform him that it was unlikely that would be able to advance to the fifth semester since his GPA was too low, making it difficult to achieve the "GPA factor" required by the end of semester 4. PLAINTIFF saw nothing wrong with his academic performance since he continued to pass all of his courses after being given academic accommodations upon his re-admission in 2012.

    b) After meeting with a financial aid counselor, ROSS failed to properly counsel PLAINTIFF regarding his question of whether repeating the

fourth semester would require him to re-pay tuition (around $19,000 at the time) and how it would affect his financial aid status upon re-enrollment. Why should PLAINTIFF continue to pay tuition and fees

c) It was questionable to whether or not the "GPA factor" would be overlooked even if he were to repeat and pass all of his courses since nearly perfect grades were required in order to meet the "GPA factor", a feat that seemed unlikely based on PLAINTIFF's past academic history. If not, then PLAINTIFF would inevitably incur even more debt upon facing another academic dismissal (even if he were to do well upon repeating the fourth semester). Moreover, it did not make sense that ROSS made it seem like there was a possible benefit for PLAINTIFF to take the final examination since ROSS knew that he had already failed CCSB well in advance of the final examination and that failure automatically triggered a "subject to dismissal" status. PLAINTIFF was awaiting a reply from Dean before the occurrence of the final examination. Unfortunately, PLAINTIFF did not receive a reply in time and took the final exam and failed one course ("Reproduction and Integumentary").

d) REGARDLESS WITH THE SITUATION REGARDING THE FINAL EXAM, ALL DAMAGES CAN BE ATTRIBUTED TO THE INTERACTION BETWEEN PLAINTIFF AND SANFORD

30.     PLAINTIFF studied for the final examination despite the overwhelming distractions and administrative uncertainties that were eminent at the time. PLAINTIFF took the final examination on March 24, 2013. As a result of the examination, PLAINTIFF failed one of his courses, "Reproduction and Integumentary", by 2 percentage points (1 question). At this point (after the final examination), PLAINTIFF had already received two "F" grades in the semester, one in CCSB and the other in "Reproduction and Integumentary".

31.     As stated in OCR's determination of a complaint later filed in 2013 (after Plaintiff's second academic dismissal), Dean mentions that it would have been "mathematically impossible" for PLAINTIFF to attain the minimum 2.00 GPA even if he repeated the fourth semester in order to advance to clinical studies. Hence, the "GPA factor" was crucial in determining if PLAINTIFF was to be promoted to the clinical semesters or not, and that his situation was no exception to the rule. Furthermore, Dr. Nelson also mentions the "GPA factor" in an e-mail dated on March 14, 2013.

32.     Accordingly, the Academic Catalog (the Catalog) mentions that "At appropriate points in the educational process, the faculty reviews the progress of

each student in order to identify any academic difficulties that may exist or are developing." This is relevant because ROSS failed to counsel PLAINTIFF of any potential academic issues even though he was in jeopardy of another academic dismissal even if PLAINTIFF were to pass all of his fourth semester courses since his overall GPA was still well under 2.00 (because ROSS egregiously factored the three "F" grades received in 2011 when PLAINTIFF was not given reasonable accommodations into his overall GPA) and subjected PLAINTIFF to the more harsh grading policies, in which PLAINTIFF was not alerted to during ADR, despite successfully progressing to subsequent semesters upon his re-admission.

33.     Since PLAINTIFF was a marginal to average student (on record) at best after re-matriculating in 2012, the administration was obligated to notify him of his academic situation because nearly "straight A" grades were required of PLAINTIFF during the fourth semester  to reach the minimum 2.00 GPA required to advance to the fifth semester.  It was assumed by PLAINTIFF that, by passing all of his courses after re-matriculation while given reasonable academic accommodations and that administration had not yet warned him of any academic troubles, he was performing satisfactorily.

34.     The inability of ROSS to counsel PLAINTIFF of his academic situation, taking into account the "GPA factor", meant that PLAINTIFF incurred unnecessary time as an enrolled student, money spent, and the stress of being a

medical student. Essentially, ROSS' conduct ultimately led to PLAINTIFF's detriment, particularly from events during his fourth semester of attendance that would prove to have long-term psychological and emotional consequences.

35.     Furthermore, it was questionable to the actual grounds leading to PLAINTIFF's dismissal. Since ROSS factored in the three "F" grades received in 2011 (into his overall GPA) when PLAINTIFF was not given reasonable academic accommodations, it was easily and reasonably assumed that the failed courses in 2011 did not count as any offense (PLAINTIFF failed three courses which would automatically have constituted a dismissal). Two offences constitutes an academic dismissal according to the Handbook. Hence, PLAINTIFF was under the reasonable impression that anymore offences, including one more "F" grade, was grounds for a "subject to dismissal" status.

36.     This assumption was somewhat affirmed when PLAINTIFF was notified that he had failed CCSB a week prior to the final examination, while awaiting a reply from the Dean, hoping that he would pardon the unexcused absences, similar to Dr. Cooles dismissing the "poor" grades due to "extenuating circumstances" and the misfortunate situation with Dr. Sanford. Although PLAINTIFF assumed that he had already committed his second offence, it was urged and recommended by faculty members that PLAINTIFF file for LOA. However, it would be redundant to file for LOA since PLAINTIFF had already

committed his second offence and would be "subject to dismissal" regardless. Hence, this was one of the reasons PLAINTIFF was also hesitant in filing for LOA due to high uncertainty and the inability of ROSS to provide proper and sound guidance, particularly during a time when PLAINTIFF was experiencing immense psychological and emotional distress, and incapable of making rational decisions in his best interests.

37.    Accordingly, it remains uncertain (due to the ambiguity of the ECR agreement) to what actually triggered the "subject to dismissal" status because it was later implied that PLAINTIFF's failure in CCSB was his first offence and the "F" grade received as result of the final examination ("Reproduction and Integumentary"). If this were the case, it would have made PLAINTIFF's decision to file for an LOA a lot easier since the  second offence would have been avoided by not sitting for the final examination. This could be the reason why it was recommended to take the LOA. However, filing for LOA would mean PLAINTIFF still must attain nearly "straight A" grades upon his return in repeat of his fourth semester, a feat that seemed highly unlikely based on prior semester performances, in order to reach the minimum 2.00 GPA requirement to advance to clinical studies beginning the fifth semester. Hence, ROSS did not counsel PLAINTIFF when they were obligated to do so, particularly in reference to the 2.00 "GPA factor" in prior semesters and that a major improvement was required.

38.    Regardless of the ambiguous nature of PLAINTIFF's "subject to dismissal" status, ROSS is liable for creating a *hostile* learning environment, evidenced by PLAINTIFF's interactions with his ICM instructor and the inability of the Dean to justly revert the grading policies (when it was intentionally or negligently concealed to his awareness during ADR that new grading policies were to take effect upon his readmission), thus giving rise to overwhelming distractions his entire time as a student, thus negatively exacerbating his substantially limited "major life activity" of concentration. In essence, PLAINTIFF was never able to solely focus on his studies his entire duration at ROSS, even in 2011 when he was distraught and extremely distracted over the fact that he was not receiving adequate and reasonable academic accommodations. Hence, PLAINTIFF did not "fairly" fail any semesters on his own merits, neither in 2011 or 2013. PLAINTIFF was never given a fair opportunity to succeed in medical school.

39.    By implementing a new grading policy without notifying the PLAINTIFF upon his readmittance, the effects of arbitrary behavior, discrimination, and the inability of ROSS to abide by its own written rules to provide proper guidance and to mention any perceived academic deficiencies, and the unjust nature of the contents and in formation of the ECR agreement, PLAINTIFF's dismissal is not genuinely an academic decision.  Furthermore, the decisions leading up to the dismissal were egregious, oppressive, arbitrary and

capricious, and shows a lack of regard for persons with disabilities and students in general. Furthermore, such conduct illustrates the "for-profit" mindset of ROSS. Such conduct from ROSS eventually led to PLAINTIFF's detriment as exemplified by his unjust academic dismissal.

40.     After being dismissed again in April 2013, PLAINTIFF underwent internal grievance procedures with ROSS, but the dismissal was upheld. Without success, PLAINTIFF filed another complaint during that summer with OCR, alleging disability discrimination and retaliatory acts committed by ROSS.

44.     The case went to mediation again, but an agreement could not be reached this time. As a result, the case went to investigation. This time, PLAINTIFF admits that his claims were without merit since he was given accommodations and there were no acts of disability discrimination. However, his claims in this suit are based on contracts and torts, parts of the law OCR does not have jurisdiction over.

45.     Consequently, the allegations were dismissed along with the case and PLAINTIFF had exhausted his legal (non-court) options with OCR by January 2014.

STATEMENT OF CLAIMS

**FIRST CAUSE OF ACTION**

(*Breach of implied-in-fact contract* v. Defendant)

46.     PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-45.

47.     The student-institutional relationship, including the general nature and terms of the agreement (e.g. student handbooks, catalogs, and other written instruments) are implied rather than to be taken literally. See *Peretti v. Montana*, 464 F. Supp. 784, 786 (D. Mont. 1979). "A contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." See *Commerce Partnership 8098 Limited Partnership v. Equity Contracting Co.*, 695 So.2d 383, 387 (Fla. 4th DCA 1997). Although ROSS is not obligated to follow the precise terms of the Student Handbook and Academic Catalog, they must follow and adhere to them to the utmost reasonable extent and expectations of both parties. "[A] [c]ourt should determine and give to the alleged implied contract "the effect which the parties, as fair and reasonable men, presumably would have agreed upon if, having in mind the possibility of the situation which has arisen, they had contracted expressly thereto." See *Bromer v. Florida Power & Light Co.*, 45 So.2d 658, 660 (Fla. 1950). A contract implied in fact is not put into promissory words with sufficient clarity, so a fact finder must examine and interpret the parties' conduct to give definition to their unspoken agreement. *Id.*; Corbin on Contracts § 562 (1960). It is to this process of defining an enforceable agreement that Florida

courts have referred when they have indicated that contracts implied in fact "rest upon the assent of the parties." *Policastro v. Myers*, 420 So.2d 324, 326 (Fla. 4th DCA 1982); *Tipper v. Great Lakes Chemical Co.,* 281 So.2d 10, 13 (Fla. 1973). Upon PLAINTIFF's payment of tuition and fees and signing of a student-institutional contract days prior to the first day of classes, this implied-in-fact contract shall exist (See *Greene v. Howard University*, 271 F. Supp. 609 (D.D.C. 1967). Moreover, even if a college reserves the right to change the student handbook unilaterally and without notice, such a reservation of rights did not defeat the implied contractual 'nature' of the student handbook.  Hence, institutional documents are still contractual regardless if they have a disclaimer since a disclaimer cannot simply defeat the implied-in-fact nature of a student-institutional contract. See *Goodman v. President and Trustees of Bowdoin College*, 135 F. Supp. 2d 40 (D. Me. 2001). Simply put, oversight of the student-institutional relationship is purely a contract that is implied-in-fact.

48.     In regards to the student-institutional implied-in-fact contract, PLAINTIFF was to adhere to institutional policies and procedures. Specifically, he must meet outlined academic and disciplinary requirements and standards (as also mentioned within the Student Handbook). Likewise, ROSS must  coordinate and conduct themselves in a manner that is not arbitrary, capricious, discriminatory, or

ill-will, and to exercise reasonable care and in the best interests of PLAINTIFF. See

*Militana v. University of Miami*, 236 So.2d 162 (Fla. App. 1970).

49.     PLAINTIFF did what was required of him or was excused from performance of this implied-in-fact contract due to the extent such obligations, covenants, or conditions of the contract have been excused, prevented or waived by ROSS' acts and omissions. Specifically, PLAINTIFF paid tuition and fees prior to matriculation at the School of Medicine and did not deviate from this contract in any way, except for by the breach itself committed by ROSS that made it impracticable and more difficult for PLAINTIFF to fulfill the duties of the contract (as set forth below in Paragraph 50), thus resulting in PLAINTIFF's unjust dismissal in which he is seeking relief from for this cause of action.

50.     There are several instances (among others) for which it is evident that ROSS breached this implied-in-fact contract, which were proximate causes leading to PLAINTIFF's loss (dismissal from the School of Medicine).

  a.   During PLAINTIFF's fourth semester of enrollment, Dr. Worrell Sanford, a clinical instructor of ROSS, subjected PLAINTIFF to discriminatory, hostile, and unfair treatment. It was even pointed out by some fellow classmates that PLAINTIFF was treated beyond unfairly, even in comparison to like-situated students. ROSS failed to take appropriate actions to rectify the issue, ultimately leading to, or was a

(or one of) proximate cause of PLAINTIFF's dismissal. Indeed, it is reasonably expected that PLAINTIFF receives an education free from discriminatory, hostile, and unfair treatment, which would otherwise defeat the purpose of PLAINTIFF's intent to enroll and pursue his career as a physician at the School of Medicine. Creating such an environment for PLAINTIFF is a clear breach of this implied-in-fact contract (See *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004)). See also (See *Bonnell v. Lorenzo*, 81 F. Supp. 2d 777 (ED Mich. 1999)).

b. ROSS failed to deliver appropriate accommodations for PLAINTIFF during his first stint at the School of Medicine. PLAINTIFF continuously pled to administrators his need for appropriate accommodations. Not only did ROSS fail to grant such accommodations, PLAINTIFF's e-mails were deliberately ignored and the issue was not addressed in any slight case. Without the proper accommodations, PLAINTIFF failed all of his first semester courses. This was a direct and only cause of PLAINTIFF's loss during his first stint at the School of Medicine. Indeed, it was reasonably expected that PLAINTIFF receive appropriate accommodations from a school that receives US federal financial funding and was aware of this fact. In

addition, ROSS also coordinated and had a Students with Disabilities office and mentions of accommodating students with disabilities in its handbook. Hence, ROSS knew it had a duty to accommodate its students to a reasonable extent and in full faith, which were reasonable expectations of both parties.

c. The ECR agreement was unconscionable, including presenting false statements that eluded PLAINTIFF during mediation. Furthermore, ROSS dismissed PLAINTIFF even knowing that upon his re-matriculation that the grading policies were changed without informing PLAINTIFF of such changes. Finally, ROSS failed to counsel and give fair warning to PLAINTIFF that he was an at risk student of being dismissed. Since PLAINTIFF passed all of his courses upon re-matriculation (given the appropriate academic accommodations), there was no reason for PLAINTIFF to suspect that he was at risk of dismissal despite his cumulative GPA being below 2.00. Not only is it stated in the Academic Catalog that ROSS must counsel PLAINTIFF since he was at risk or "at particularly points …" student from their perspective, it is also implied that they do so taken into consideration the specific nature of PLAINTIFF's and ROSS' relationship and how ROSS' inability to adhere to this portion of the

Catalog was material regarding PLAINTIFF's subsequent dismissal. It is simply ridiculously that PLAINTIFF had to "pump" more money into the accounts of ROSS when it could be foreseen that PLAINTIFF was going to be dismissed in the near future based on his inability to meet the "GPA factor" regardless. As any reasonable person would see, these multiple factors clearly put PLAINTIFF at a major disadvantage, thus rendering PLAINTIFF's subsequent dismissal arbitrary, capricious, egregious, and non-academic in nature.

An "expulsion from an institution of higher education amounts to a very serious penalty for the dismissed student. It is arguable that a law or medical student, due to his or her education's focus on specific purposes and outcomes … is more likely than another type of graduate student to have his or her interests protected." See *Soglin v. Kauffman*, 295 F. Supp. 978, 988 (W.D. Wis. 1968). Accordingly, ROSS' oppressive and egregious conduct towards PLAINTIFF is with disregard to his well-being, knowing that it is foreseeable that such conduct would cause substantial emotional harm.

51.     As a legal result of ROSS' breach of implied-in-fact contract, PLAINTIFF suffered damages, specifically from his unjust dismissal from medical school and the serious negative personal and economic consequences as a result of such a dismissal and ROSS' inability to ever give PLAINTIFF a "fair shot". Hence,

PLAINTIFF is entitled to compensatory and special damages specified in Civil Jury Instructions.

## SECOND CAUSE OF ACTION

### (*Breach of Contract v. Defendant*)

52.     PLAINTIFF re-alleges and incorporates by reference allegations contained in Paragraphs 1-51.

53.     An institution is to adhere to its own written rules and procedures in catalogs and student handbooks. See *Fellheimer v. Middlebury College Corp.*, 869 F. Supp. 238 (D. Vt. 1994). Unless indicated otherwise in a disclaimer or reservation clause, statements within written instruments (e.g. the Handbook, Catalog) may be enforceable contractual provisions between the student and the institution itself (See *Tobias v. The University of Texas at Arlington*, 506 U.S. 1049; 113 S. Ct. 966; 122 L. Ed. 2d 122; 1993 U.S. Lexis 66; 61 U.S.L.W. 3477 (1993)), particularly if they are issues of material fact to PLAINTIFF's claim(s).

54.     Rule 408 (Federal Rules of Evidence) permits disclosure of confidential settlements if so requires due to a breach of the settlement agreement (See *Cates v. Morgan Portable Bldg. Corp.*, 708 F.2d 683 (7th Cir. 1985)). Hence, a breach *overrides* a disclaimer stating that the contents of the mediation shall not be disclosed in any future litigation as so stated in the ECR agreement. <u>Please refer to Exhibit A entitled "ECR Agreement".</u>

55.     PLAINTIFF did what was required of him or was excused from performance of the ECR agreement due to the extent such obligations, covenants, or conditions of the contract have been excused, prevented or waived by ROSS' acts and omissions. Specifically, PLAINTIFF paid tuition and fees prior to matriculation at the School of Medicine and did not deviate from this contract in any way, except for by the breach itself committed by ROSS that made it impracticable and more difficult for PLAINTIFF to fulfill the duties of the contract (as set forth below in Paragraph 56), thus resulting in PLAINTIFF's unjust dismissal in which he is seeking relief from for this cause of action.

56.     Accordingly, ROSS breached clause 4 of the ECR agreement, which also aligns with the promise to "at certain points during the educational process...." as referenced in the Academic Catalog. Although it is not required that ROSS follows the terms of the Catalog and Handbook literally, they are to do so if such are reasonable expectations of both parties (and if there is a special relationship) and that such a failure to do so could lead to PLAINTIFF's detriment and is material to PLAINTIFF's claims. Providing proper guidance and counseling, particularly when PLAINTIFF is seen as "at risk" to academic dismissal despite his ability to satisfactorily meet academic requirements upon his re-matriculation (when given appropriate accommodations), is part of this implied relationship and is reasonably expected.

57.     As a legal result of ROSS' breach of contract, PLAINTIFF suffered damages, specifically his dismissal from medical school and the serious negative personal and economic consequences as a result of such an unjust dismissal. Hence, PLAINTIFF is entitled to compensatory and special damages as specified in Civil Jury Instructions.

### THIRD CAUSE OF ACTION

*(Breach of Covenant of Good Faith and Fair Dealing v. Defendant)*

58.     PLAINTIFF re-alleges and incorporates by reference allegations contained in ¶ 1-57.

59.     PLAINTIFF has established that a contract exists (implicitly) between the student and university, which may be referenced from the Handbook and the Catalog (among other written instruments) and the nature of the student-institutional relationship (see first cause of action). In addition, within every contract is an implied covenant of good faith and fair dealing ("The implied covenant of good faith and fair dealing exists in virtually all contractual relationships" (See e.g. *Sepe v. City of Safety Harbor*, 761 So.2d 1182, 1184 (Fla. 2d DCA 2000)) where neither party will do anything which will injure the right of the other to receive the benefits of the agreement. The purpose of the implied covenant of good faith is "to protect the reasonable expectations of the contracting parties." *Ins. Concepts & Design, Inc. v. Healthplan Services, Inc.*, 785 So.2d 1232,

1234-35 (Fla. 4th DCA 2001).  *See also Cox v. CSX Intermodal, Inc.*, 732 So.2d

1092, 1097 (Fla. 1st DCA 1999) ("[T]he implied covenant of good faith and fair

dealing is designed to protect the contracting parties' reasonable expectations.").

      60.    Good faith and fair dealing demands cooperation, observation of

reasonable commercial standards and excludes behavior inconsistent with common

standards of decency, fairness, and reasonableness, and with the parties'

agreed-upon common purposes and justified expectations. U.C.C. § 2-103(1)(b). It

requires that one party "do nothing destructive of the other party's right to enjoy the

fruits of the contract and to do everything that the contract presupposes they will do

to accomplish that purpose" (See *Conoco, Inc., v. Inman Oil Co.*, 774 F.2d 895, 908

(8th Cir. 1985) (quoting *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 728 (7th

Cir. 1979)). Specifically, ROSS interfered with PLAINTIFF's academic

performance through learner mistreatment, in particular in reference to the CCSB

course, thus creating an overwhelming obstacle for PLAINTIFF to fulfill his

obligations of the contract (via satisfactory academic performance). Dr. Sanford's

inexcusable conduct towards PLAINTIFF caused substantial emotional and

psychological harm that negatively affected his performance and attendance since

such treatment was pervasive in nature and created an adverse learning

environment that was not adequately addressed and remedied by administrators.

Teachers have the right to regulated expression but may not use their first

amendment privileges punitively or discriminatorily (See *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004)) or in a way which prevents students from learning by ridiculing, proselytizing, harassment or use of unfair grading practices (See *Bonnell v. Lorenzo*, 81 F. Supp. 2d 777 (ED Mich. 1999)). Likewise, such actions were in fact so 'material', impeding PLAINTIFF's ability to perform what was required of him of the contract, namely his efforts to attain satisfactory academic progress, while infringing on his right to an education free from a discriminatory, hostile learning environment.

61.    "Fairness" in the context of good faith and fair dealing as it pertains to this case follows that decisions cannot be made arbitrarily or capriciously (See *Board of Curators of the University of Missouri et al. v. Horowitz* (1978). Extremely material to PLAINTIFF's unjust dismissal is the arbitrary and capricious nature of his dismissal. A reasonable person would see PLAINTIFF's dismissal as one decided upon in bad faith, wantonly, and without a discernible rational basis. Decision making should not be arbitrary or capricious, random and, thus, interfere with fairness. This is a form of discrimination (See *Sharick v. Southeastern University of Health Sciences*, Inc., 780 So. 2d 142 (Fla. Dist. Ct. App. 2001). Despite PLAINTIFF's dismissal is based on grounds for "poor academic performance", his dismissal clearly and reasonably goes beyond that of an academic decision. Such irrational decisions, in light of the relationship and

circumstances that led to his unjust dismissal, interfered with PLAINTIFF's chances of fulfilling the requirements of the student-institutional contract and successfully advancing through the medical curriculum.

62.     In addition, the facts surrounding the formation stage of the ECR agreement was unconscionable. Good faith dealing compels honesty and the avoidance of fraud and misrepresentation. There was absence of good faith and honesty during mediation, making PLAINTIFF believe every representation of ROSS to be true at a time when PLAINTIFF was eager to return to medical school as soon as possible. For example, it was strictly informed to PLAINTIFF that the "F" grades acquired during his first stint at the School of Medicine could not be overturned and that the grades *must* remain. After PLAINTIFF spoke to a particular graduate from the School of Medicine (after re-matriculation), it was said that "he had friends that settled with ROSS and that their grades were indeed changed to their liking because ROSS feared that their federal financial aid would be script of them" (not exactly verbatim). Furthermore, PLAINTIFF was not informed of any grading policy changes upon his readmission. If a student, for instance, is absent for a semester and is not continuously enrolled they need to know if degree requirements have changed (See *Brody v. Finch University* (1998)), particularly if this change affected "meeting of the minds" during ADR mediated by OCR in 2011. It is expected that PLAINTIFF be informed of such changes since such

information was material in determining whether or not PLAINTIFF would or would have not accepted the contract terms of the ECR agreement, and hence, be readmitted under the contract provisions of the Student Handbook and Academic Catalog. This misrepresented fact or omission of such disclosure was material of PLAINTIFF's negotiating power during ADR. "There is substantial authority stating that the reason why disclosures are mandated in the negotiation of a contract is that notions of good faith and fair dealing require such disclosures" (citation omitted).

63.    "In the absence of an improper motive, an academic dismissal must be 'such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment" (See *Regents of University of Michigan v. Ewing* 474 U.S. 214 (1985)). Indeed, PLAINTIFF was subject to unscrupulous and hostile treatment as a student. Moreover, his academic dismissal was beyond arbitrary and capricious with no discernible rational basis.

64.    As a legal result from the breach of the covenant of good faith and fair dealing, PLAINTIFF should be awarded general, specific, and punitive damages as permitted by law [cite statute for damages].

### **FOURTH CAUSE OF ACTION**

(*Negligent misrepresentation* v. Defendant)

65.     PLAINTIFF re-alleges and incorporates by reference allegations contained in Paragraphs 1-64.

66.     Academic institutions are required to disclose material information, if without disclosure, such non-disclosure would lead to become a proximate cause of PLAINTIFF's detriment.

67.     ROSS' negligent (or even perhaps fraudulent) misrepresentation or omission of facts, in particular the failure of ROSS to notify PLAINTIFF of substantial grading policy changes and communicating to him that the "F" grades *must* remain, misled PLAINTIFF during ADR in 2011 and greatly affected the outcome of mediation. But for ROSS' misrepresentation of material facts, PLAINTIFF would not have agreed to the already unconscionable terms conducted at mediation since this would have been a clear disadvantage to PLAINTIFF. Such misrepresentation of material facts are proximate causes or concurrent causes leading to PLAINTIFF's dismissal in 2013.

68.     ROSS made a statement of material fact during mediation in 2011, in which PLAINTIFF took to be true, but was not. ROSS' representative, Dr. Agnes LaVille, was negligent (or possibly fraudulent) in making the statement of material fact when she should have known (or did know) that such information was false.

69.     Also, ROSS omitted information concerning a material fact that was substantial during ADR in 2011. ROSS omitted this information of material fact, in

which PLAINTIFF was reasonably unaware of and that it was true that there were no omitted material facts, in which there were. ROSS' representative, Dr. Agnes LaVille, was negligent (or fraudulent) in omitting such information of material fact when she should have known (or did know) that such information was necessary for good faith negotiations during mediation.

70.    In both cases, Dr. Agnes LaVille clearly misrepresented material facts during ADR in 2011 with the intent of PLAINTIFF to rely on such representations and omission of material facts. PLAINTIFF relied on such representations and omission of material facts, which were proximate or concurrent causes of PLAINTIFF's ultimate dismissal in 2013.

71.    As a legal result of the foregoing, the ECR agreement should be rendered unenforceable, in part or in whole, and PLAINTIFF should be entitled to other relief as justifiable.

## **FIFTH CAUSE OF ACTION**

(*Negligence in general* v. Defendant)

72.    PLAINTIFF re-alleges and incorporates by reference allegations contained in Paragraphs 1-71.

73.    ROSS' relationship with PLAINTIFF is one that requires a high level of care in certain aspects. ROSS' duty of care to PLAINTIFF is at least 2-fold. For example, Furthermore, ROSS' affirmative conduct in regards to its services in

providing disability accommodations to qualifying students renders such high level of [reasonable] care. They are to exercise this reasonable care to at least the minimum level that is reasonably expected of other institutions that accommodates students with disabilities, as the case with PLAINTIFF. Moreover, it is pertinent that ROSS makes a clear indication that they do not discriminate on the basis of race, sex, religion, age, and disability as stated in their anti-discrimination clause. Finally, is foreseeable that a breach of this duty of care would most likely cause personal or even emotional harm since dismissal from a medical school has serious implications on one's career aspects and the ill-effects are paramount (See *Soglin v. Kauffman*, 295 F. Supp. 978, 988 (W.D. Wis. 1968). Hence, it makes sense, and a matter of law and theory, that ROSS owed a duty of care to PLAINTIFF.

74.     In addition, ROSS' negligent conduct towards PLAINTIFF by failing to provide him with appropriate academic accommodations was beyond egregious and appalling. After informing school administrators, namely Dr. Kallicharan, of ROSS' clear misinterpretation of the required accommodations necessary for PLAINTIFF, ROSS made no effort whatsoever to address and communicate with PLAINTIFF regarding his concerns. Several e-mails were sent to Dr. Kallicharan, who blatantly ignored them without responding for nearly two months. When PLAINTIFF attempted to address the issue with administrators, he was silenced and ignored. As a result, PLAINTIFF took all examinations during his first stint at

the School of Medicine without proper accommodations as requested by him. Such deliberate indifference was a direct and proximate cause of PLAINTIFF's dismissal in 2011.

75.    As a legal cause of the foregoing, PLAINTIFF is entitled to compensatory and special damages as a consequence of his dismissal in 2013. Furthermore, he should be entitled to punitive damages due to ROSS' oppressive and egregious conduct.

## SIXTH CAUSE OF ACTION

(*Intentional/negligent infliction of emotional distress* v. Defendant)

76.    PLAINTIFF re-alleges and incorporates by reference allegations contained in Paragraphs 1-75.

77.    ROSS acted egregiously and with reckless disregard, and with high likelihood, that such conduct would inflict severe and pervasive emotional distress to PLAINTIFF. ROSS' extreme negligent conduct and deliberate indifference is foreseeable to PLAINTIFF's detriment. Moreover, there is no legitimate and justifiable reason for ROSS' dismissal of PLAINTIFF. PLAINTIFF's arbitrary, capricious, bad faith dismissal indicates that ROSS acted recklessly, and such recklessness is a legal and proximate cause of PLAINTIFF's injuries. *It is also important to note that PLAINTIFF suffered emotional distress at many different*

*points in time since his dismissal, setting into motion different points when*

*PLAINTIFF suffered (damages) as it relates to the period of limitations.*

78.     As a legal cause of the foregoing, PLAINTIFF is entitled to

compensatory and punitive damages to deter ROSS from such conduct in the

future.

### **DISCUSSION FOR "PRAYER" FOR RELIEF**

79.     PLAINTIFF is entitled to special, general, and punitive damages.

80.     PLAINTIFF is also entitled to special damages amounting and limited

to what is reasonably *foreseeable*. See *Sharick v. Se. University of the Health*

*Sciences, Inc.*, 780 So.2d 136, 139 (Fla. 3d DCA 2000). "Special damages are those

that do not *necessarily* result from the wrong or breach of contract complained of,

or which the law does not imply as a result of that injury, even though they might

naturally and proximately result from the injury. More succinctly, special damages

are damages that do not follow by implication of law merely upon proof of the

breach." (citations omitted).  *Land Title of Central Fla., LLC v. Jimenez*, 946 So.2d

90, 93 (Fla. 5th DCA 2006). For special damages, *In re Standard Jury Instructions*

*– Contract and Business Cases, Instruction 504.3-504.4*, 116 So. 3d 284 (Fla.

2013)) requires that PLAINTIFF prove that:

a) Defendant caused Claimant to lose profits; AND

b) Claimant can prove with *reasonable certainty* the amount in lost profits. To establish the amount of lost profits with reasonable certainty, Claimant must prove that a reasonable person would be satisfied that the amount of lost profits which Claimant may be entitled to recover is not simply the result of speculation or guessing.  Instead, Claimant must prove that there is some standard by which the amount of lost profits may be established. Claimant does not have to be able to prove that the amount of lost profits can be calculated with mathematical precision as long as Claimant has shown there is a reasonable basis for determining the amount of the loss.

Accordingly, PLAINTIFF should be entitled to such special damages as follows:

a) A psychiatrist's average gross income of $281,258 per year

   (1salary.com) as of April 2019, practicing in San Francisco, CA,

   beginning the year 2019, which is the expected date for which

   PLAINTIFF would have assumed to have graduated from an approved

   medical residency in psychiatry. This value should be multiplied by the

   number of years for which PLAINTIFF would have practiced

medicine. As such, thirty years would be a fair and reasonable estimate. This amounts to $8.44 million assuming that PLAINTIFF would not hold a private medical practice.. After taxes, this amounts to approximately $5.48 million, assuming 35% tax for the income as stated.

b) An average net income of $50,000 (to be conservative) per year for a medical resident for four years (2015-2019), the timeframe for which PLAINTIFF would have reasonably been a resident but for ROSS' alleged breaches and tortuous acts. This amounts to $200,000. Also, PLAINTIFF is stuck with $160,000 in student loan debt.

c) Hence, special damages total approximately (as a reasonable estimate) $5.85 million. However, this does not even take into account the increase in standard of living in the area, inflation, and potential accumulated benefits. To create an extremely conservative estimate, it would be reasonable to add an additional 1.5 percent per year for thirty years. As such, PLAINTIFF is uncertain upon making such calculations to arrive to a proper amount and relies on the jury to make such

calculations, but acknowledges that special damages are worth *at least* $5.85 million.

81.    For general damages, "It is well-settled that the injured party in a breach of contract action is entitled to recover monetary damages that will put it in the same position it would have been had the other party not breached the contract." *Capitol Environmental Svcs., Inc. v. Earth Tech, Inc.*, 25 So.3d 593, 596 (Fla. 1st DCA 2009). ("Damages recoverable by a party injured by a breach of contract are those which would naturally result from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was made."). *Sharick v. Se. University of the Health Sciences, Inc.*, 780 So.2d 136, 139 (Fla. 3d DCA 2000).

82.    PLAINTIFF requests that general damages be collected for pain and suffering, and undue hardship resulting from Defendant's liable actions. Although there is not an exact amount that could be calculated, the following should be considered (but not limited to) by the jury upon deciding an appropriate amount resulting from the "wrongs" committed by ROSS:

   a.  Caused the PLAINTIFF depression, anxiety, and occasional thoughts of suicide

   b.  Caused PLAINTIFF to leave a field of work he dreamed of being in

c.  Caused the deterioration of the PLAINTIFF's social life, particularly around his own family and spouse's family

d.  Exacerbated a pre-existing condition of the PLAINTIFF (OCD)

e.  Caused PLAINTIFF to be destitute, resulting in PLAINTIFF and his family to live under government assistance and spouse's income

f.  Caused PLAINTIFF and spouse to live in crowded home with in-laws

g.  Caused PLAINTIFF to have long-term feelings of helplessness and hopelessness

h.  Adversely affected PLAINTIFF's relationships with wife and children

i.  Adversely affected PLAINTIFF's relationship with his spouse such that the Plaintiff has been continuously denied sexual intimacy

j.  Inflicted insecurity about PLAINTIFF's future and career, and his inability to provide emotional and financial support for his spouse and children, thus making PLAINTIFF feel "less of a man"

k.  Caused an undue burden on PLAINTIFF's family by forcing wife to return to work to support the family

l.  May have caused PLAINTIFF to have a reduced or shortened lifespan due to physical and exacerbated mental health problems

## CONCLUSION

83.     After the conclusion of the case filed with OCR, PLAINTIFF

underwent a lengthy period of depression. He was diagnosed, in addition to his

pre-existing diagnosis of Obsessive-Compulsive Disorder (OCD), with Recurrent

Major Depression by his psychiatrist, Dr. Mandeep Reddy, M.D. on March 5, 2014.

84.     PLAINTIFF has suffered an immense amount of emotional distress,

pain and suffering,  and psychological damage resulting from the oppressive

actions of ROSS. PLAINTIFF continues to have daily feelings of doubt, shame,

embarrassment, and insecurity. The relationship between PLAINTIFF and his

spouse has been a very negative one. Heated arguments take place nearly daily due

to the PLAINTIFF's frustration and the greater expectations the spouse has of him.

There have been periods of short separation between the couple. It has come to a

point, in which both are only together "for the kids". Also, PLAINTIFF has been

unable to be sexually intimate with his spouse as often as before.

49.     The plan while PLAINTIFF was in medical school was for his spouse

to quit her job in order to take care of the children and raise them. However, the

incident with ROSS required his spouse to look for a new job and to work full-time

to financially support the family since PLAINTIFF was unable to find work,

particularly with his emotional and psychological ill-health and inability to cope

with his dismissal at ROSS. Furthermore, the situation became so horrendous at

one point that PLAINTIFF was homeless for a week as a result of his depression

and did not want his children to see what their father had become. Hence, such events depicts the psychological and emotional and financial burden ROSS inflicted on PLAINTIFF and his family.

85.    Aside from the struggles with his spouse, PLAINTIFF became uncharacteristically and noticeably abusive towards his children. He became easily annoyed and irritable with everything that went on. Furthermore, his eldest child continued to question her parents' love for her as a result of the continuous arguing within the household and the lack of affection between the couple. Being a father of young children, PLAINTIFF did not have the chance to enjoy these precious and memorable years due to his depression, anger, and sense of insecurity.

86.    PLAINTIFF has also suffered humiliation and shame from within his family, relatives, and spouse's relatives. Hence, his reputation has been tarnished and his livelihood taken away. For example, he would seldom attend family get-to-togethers such as barbeques and birthday parties due to fear of rejection, ridicule, and judgment. In several instances, his spouse's relatives questioned why she would still be involved with such a "loser". His spouse's father, a person PLAINTIFF sees daily, would often call him a "deadbeat" and mutter words in Spanish to neighbors. Also, PLAINTIFF's parents would not know what to say when asked of their child's life situation. Such feelings of shame and humiliation

has affected PLAINTIFF's emotional and psychological well-being as well as his relationships with the people who matter the most in his life.

87.    Troubled for years following his unjust dismissal, PLAINTIFF fell into greater depression and picked up gambling to a point in which he became addicted. As of December 2018, PLAINTIFF has completely separated from the mother of his children, in which she cited  lack of personal success, relationship with the children,  and gambling addiction as factors as to why she left PLAINTIFF. PLAINTIFF currently sees a psychiatrist in San Francisco's Kaiser Permanente, Dr. David Chou, and a therapist, Todd Moldovan, both in the Department of Psychiatry, for his ongoing psychological treatment.


**WHEREFORE**, PLAINTIFF prays for judgment against ROSS as follows:

1) For *lost of past and future income* totalling $5.85 million USD, in addition to earnings adjusted for by inflation and other factors (e.g. accumulated benefits), according to preponderance of proof.

2) General damages for emotional distress, pain, and suffering for which the jury is able to reasonably calculate. PLAINTIFF desires at least $10 million (not relatively as much considering the cost of living in San Francisco) for general damages since "there is no price that could be put on" what ROSS has done to PLAINTIFF (especially being a "family man").

3)  For *punitive damages* as a result of egregious and *oppressive* conduct on

behalf of ROSS, according to preponderance of proof AND

4)  Procedural and miscellaneous costs AND

5)  For such and further relief as the court deems just and proper.

DATED: May 31, 2019

By: David T. Tran, *pro se* litigant

# EXHIBIT A

### Early Complaint Resolution Agreement
David Tran and Ross University
OCR Case No. 02-11-2151

In order to resolve the above-referenced complaint filed with the U.S. Department of Education, New York Office for Civil Rights (OCR Case No. 02-11-2151), Ross University (the University) and David Tran (the Complainant) agree to the following:

*Without having to pay application fee*

1) The Complainant will -apply for re-admission to the University, and the Complainant will be admitted to the University as a 1st semester student, commencing in the spring 2012 semester. Following his application and re-admission, the University will enroll the Complainant, and allow him to re-matriculate as a 1st semester student at the University.

2) The University will allow the Complainant to return to the University without prejudice.

3) The University will waive tuition for the Complainant's first three semesters as a re-matriculated student, provided Complainant re-matriculates and then successfully advances to his second and third semesters at the University.  It is expressly understood and agreed that Complainant will be entitled to no consideration in lieu of tuition if he fails to re-matriculate or successfully advance to his second or third semesters.

4) The Complainant's existing grades will stand; however, if the Complainant performs well moving forward the Complainant can explain that his grades resulted from  unanticipated difficulties experienced regarding his accommodations and at the start of the fall 2012 semester the University's chief academic officer will personally counsel him regarding how he can overcome these grades.

1 of 3

ECR Agreement, Ross University and David Tran, OCR Case No. 02-11-2173, Page 2

5) The Complainant's existing professionalism cards will not count against him; however, upon re-matriculation the Complainant will be subject to the University's policies and procedures with respect to professionalism cards going forward.

6) If the Complainant seeks academic adjustments or accommodations, the Complainant must make a new and timely request and provide current supporting documentation, in accordance with the University's policies and procedures.

7) If the Complainant seeks and is granted testing in an alternate location as an academic adjustment, only fellow students  who are being afforded extra time and/or a distraction free environment will be permitted to take the test in the same location as the Complainant.

8) The Complainant reserves the right to take appropriate legal and/or administrative action if he believes that the University has taken discriminatory actions against him.

9) Complainant and the University shall keep the existence and contents of this Agreement strictly confidential.  It is expressly understood and agreed, however, that nothing herein shall preclude Complainant or the University from disclosing the existence or contents of this agreement pursuant to a court order or other valid legal process.  In the event such a formal demand for disclosure is made upon one of the parties, that party shall promptly notify the other party in writing of said demand so as to afford that other party the opportunity (but not

2 of 3

ECR Agreement, Ross University and David Tran, OCR Case No. 02-11-2173, Page 2

the obligation) to object to and oppose such disclosure.  Any violation of this confidentiality

provision shall constitute a material branch of this agreement.


Both the Complainant and the University agree that this agreement resolves the allegations filed

in the above-referenced complaint with OCR.   Both the Complainant and the University

understand that if a breach of this agreement occurs, the Complainant has the right to file another

OCR complaint.  To be considered timely, the new complaint must be filed either within 180

days of the date of the original alleged discrimination, or within 60 days of the date the

Complainant obtains information that a breach of this agreement occurred, whichever date is

later.  If such a new complaint is filed, OCR will address the original allegation(s) filed in the

above-referenced OCR complaint and will not address the alleged breach of the agreement.


**Agreed to:** _____        **Date:** ___10-20-2011___
          **David Tran, Complainant**


_____        **Date:** _____
          **Ross University**

Ross signed electronically
by Dr. Nancy Perri (10-21-2011)


-3-

3 of 3

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY
★ MAIL ★

PRIORITY
★ MAIL ★

UNITED STATES
POSTAL SERVICE ®

VISIT US AT USPS.COM ®
ORDER FREE SUPPLIES ONLINE

FROM:

David T. Tran
1871 Donner Ave.
San Francisco, CA
94124

TO:
Wilkie D Ferguson Jr.
U.S Courthouse
400 North Miami Ave,
Room 8N09
Miami, FL 33128

Label 228, March 2016

P S00001000014

FOR DOMESTIC AND INTERNATIONAL USE
OD: 12.5 x 9.5

FROM:

PRIORITY MAIL
POSTAGE REQUIRED

UNITED STATES
POSTAL SERVICE ®

P   PRIORITY MAIL 2-Day ®

US POSTAGE PAID
$7.35
Retail

Origin: 91752
05/31/19
0549620793-06

1 Lb 2.80 Oz
1006

EXPECTED DELIVERY DAY: 06/03/19

SHIP
TO:   400 N MIAMI AVE
RM 8N09
MIAMI FL 33128-1805

C075

USPS TRACKING NUMBER

9505 5138 1312 9161 3292 72

VISIT US AT USPS.COM ®
ORDER FREE SUPPLIES ONLINE

POSTAL SERVICE ®